ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE PRIMERA INSTANCIA
SALA DE SUPERIOR DE SAN JUAN

| | |
|---|---|
| Ana Elena Roig Cardenales, Ana Martínez Vázquez, Ángel Tellado, Brenda Liz Martínez, Carmen Morgado Ortiz, Carmen Plaza, Efraín Figueroa Báez, Germán Delgado Lugo, Gloria Torres Meléndez, Iria Alvarado Collazo, José Luis Matos González, Lourdes Rivera González, Lynda Colón López, Miriam I Vélez Ocasio, Nilda J Acosta Montalvo, Víctor D. Pérez Vázquez, Wilfredo Casiano, Yolanda Claudio, Yadira Delgado, Ana B Castro Rodríguez, María Castro Rodríguez, María de los Ángeles Vega Oliveras. | ACCIÓN CIVIL NÚM.: SJ2020CV04933 **PRODUCTO DEFECTUOSO** |
| Demandantes<br>v. | |
| Boehringer Ingelheim Pharmaceuticals, Inc.; Boehringer Ingelheim Corporation; Boehringer Ingelheim USA Corporation; GlaxoSmithKline Puerto Rico, Inc.; GlaxoSmithKline LLC; GlaxoSmithKline (America) Inc.; Pfizer Pharmaceuticals LLC; Pfizer Inc.; Sanofi-Aventis Puerto Rico Inc.; Sanofi-Aventis U.S. LLC; Sanofi US Services Inc.; Amerisource Corporation; AmerisourceBergen Corporation; Cardinal Health P.R. 120, Inc.; Cardinal Health P.R. 218, Inc.; Cardinal Health P.R. 436, Inc.; Cardinal Health P.R. 220, LLC; McKesson Corporation; Puerto Rico CVS Pharmacy, L.L.C.; Walgreen of Puerto Rico, Inc.; Drogueria Betances LLC; Farmacias Caribe, Inc.; Farmacia Cristina LMDM LLC; Farmacia Marilyn; Farmacia El Tuque; Farmacia Baldorioty, Inc.; Corporacion Flores Rivera; Super Farmacia Nelia, Inc.; Wal-Mart Puerto Rico, Inc.; Fulanos de Tal 1 -100. | |
| Demandados | |

**PRIMERA DEMANDA ENMENDADA**

**AL HONORABLE TRIBUNAL:**

**COMPARECE**, Ana Elena Roig Cardenales, Ana Martínez Vázquez, Ángel Tellado, Brenda Liz Martínez, Carmen Morgado Ortiz, Carmen Plaza, Efraín Figueroa Báez, Germán Delgado Lugo, Gloria Torres Meléndez, Iria Alvarado Collazo, José Luis Matos González, Lourdes Rivera González, Lynda Colón López, Miriam I Vélez Ocasio, Nilda J Acosta Montalvo, Víctor D. Pérez Vázquez, Wilfredo Casiano, Yolanda Claudio, Yadira Delgado, Ana B Castro Rodríguez, María Castro Rodríguez, María de los Ángeles Vega Oliveras, representados por la representación legal que suscribe, y muy respetuosamente ALEGAN y SOLICITAN:

## INTRODUCCIÓN

1.  La Administración de Alimentos y Medicamentos de los EE.UU. (FDA, por sus siglas en inglés) anunció el 1 de abril de 2020 que estaría solicitando a los fabricantes que retiren del mercado inmediatamente todos los medicamentos recetados y de venta libre ("over-the-counter") hechos a base de ranitidina, también conocida popularmente en Puerto Rico por su nombre anglosajón, ranitidine. Esta fue la más reciente y más drástica medida que tomaron las autoridades federales como parte de la investigación en curso que gira en torno a una impureza conocida como N-nitrosodimetilamina (NDMA, por sus siglas en inglés) en medicamentos hechos a base de ranitidina (también comúnmente conocidos en Puerto Rico por la marca "Zantac" o el nombre de su genérico en inglés, "Ranitidine"). La NDMA es un conocido cancerígeno humano, es decir, una sustancia que puede causar cáncer. La FDA ha determinado que la impureza en estos productos hechos a base de ranitidina aumenta con el tiempo y cuando se almacena a temperaturas superiores a la temperatura ambiente, y puede resultar en la exposición de los consumidores a niveles

2

inaceptables de esta impureza. Estos hallazgos son particularmente relevantes en Puerto Rico, ya que la temperatura tiende a ser mucho elevada que lo que de ordinario se considerara temperatura ambiente. Como resultado de la determinación de la FDA del 1 de abril de 2020, los productos hechos a base de ranitidina ya no pueden ser vendidos ni adquiridos legalmente en Puerto Rico.

2. Durante el verano de 2019, la FDA reconoció de pruebas por parte de laboratorios independientes que encontraron NDMA en la ranitidina. Bajos niveles de NDMA son ingeridos comúnmente en la dieta; por ejemplo, la NDMA está presente en alimentos y el agua. No se espera que estos bajos niveles den lugar a un aumento en el riesgo de cáncer. Sin embargo, niveles de exposición continuos más altos pueden aumentar el riesgo de cáncer en humanos. Inicialmente, para verano de 2019, la FDA no tenía suficiente evidencia científica para recomendarles a los consumidores que continuaran tomando o que dejaran de tomar los medicamentos hechos a base de ranitidina, pero se continuó con la investigación y alertó al público el 13 de septiembre de 2019 de los *posibles* riesgos y a que considerara tratamientos de venta libre o recetados alternativos. Posteriormente, nuevas pruebas y análisis realizados por la FDA, impulsados por los laboratorios de terceras partes, confirmaron que los niveles de ranitidina aumentan incluso bajo condiciones de almacenaje normales, y se encontró que los niveles de la NDMA aumentan considerablemente en las muestras que se almacenan a temperaturas superiores, incluyendo las temperaturas a las que el producto puede ser expuesto durante su distribución y manejo de los consumidores. Las pruebas también mostraron que a medida que el producto a base de ranitidina envejece, o que el periodo de tiempo desde que fue fabricado se alarga, más alto es el nivel de la NDMA. Estas condiciones pueden elevar el nivel de la

NDMA en el producto hecho a base de ranitidina sobre el nivel de ingesta diaria aceptable.

3. La FDA envió cartas a todos los fabricantes de productos hechos a base de ranitidina solicitando que retiraran sus productos del mercado. La FDA también alertó a los consumidores que toman productos hechos a base de ranitidina *over the counter* a que dejen de tomar las tabletas o líquido que tuviesen en la casa, los desechen de forma adecuada y que no los compren más. Se recomendó también que los pacientes que toman productos hechos a base de ranitidina recetados deben hablar con su profesional de atención médica sobre otras opciones de tratamiento antes de dejar de tomar el medicamento, ya que hay varios medicamentos aprobados para el mismo uso o uso similar como los productos hechos a base de ranitidina que no tienen los mismos riesgos debido a la NDMA.

## HECHOS

4. Zantac es la marca comercial de ranitidine, un medicamento ampliamente conocido en Puerto Rico que era vendido como uno seguro para combatir la acidez estomacal. Pero en la realidad, el ranitidine no era seguro. El ranitidine tiene una estructura molecular inestable que se que se rompe en condiciones normales y libera altos niveles de N-nitrosodimetilamina (en adelante, "NDMA"), un carcinógeno potente y peligroso. Después de casi cuatro décadas de su debut y billones de dólares en ventas, el consumo de ranitidine ha causado que miles de consumidores hayan desarrollado cáncer. El propósito de esta acción es hacerle justicia a personas que han sido víctimas que han sufrido daños y perjuicios (y en algunos casos, la muerte) como resultado de las acciones de la parte demandada, a saber, el diseño, manufactura, prueba, mercadeo, etiquetamiento, empaque, manejo,

distribución, almacenamiento y/o venta de ranitidine bajo el nombre comercial Zantac como en su genérico.

5. Hasta que su retiro fue ordenado por la FDA el 1 de abril de 2020, ranitidine era un medicamente extremadamente popular que era consumido a diario por miles de personas en Puerto Rico. Para ilustrar el alcance del impacto del medicamento, es plausible afirmar que casi todos los residentes de Puerto Rico han tomado ranitidine o tienen un familiar o conocido que ha tomado ranitidine.

6. Estudios científicos recientes confirman que los fabricantes de la ranitidine sabían o debían haber sabido hace varias décadas una verdad muy inconveniente para estos: la ingesta de ranitidine expone al consumidor a niveles extraordinarios de NDMA.

7. NDMA es un cancerígeno potente. Fue descubierto inicialmente en la temprano en el Siglo XX ya que se producía de manera incidental a la manufactura de combustible de cohetes. Hoy en día, su único uso es para inducir tumores en animales como parte de experimentos de laboratorio. Su única función es causar cáncer. No tiene ningún valor medicinal.

8. La NDMA no es como otros compuestos que tienen un efecto positivo a la salud cuando la exposición es a bajos niveles y un efecto negativo cuando la exposición es a altos niveles. No existen recomendaciones de ingesta o dosis diarias de NDMA. El nivel ideal de exposición es cero. Sin embargo, la FDA también ha indicado que la ingesta diaria de NDMA es 96 nanogramos (ng)[1] para *minimizar* los riesgos asociados por esta molécula peligrosa. Sin embargo, una pastilla de ranitidine contiene cantidades de NDMA que son cientos de veces más altas que el límite permitido.

---

[1] Un nanogramo es equivalente a la milmillonésima parte de un gramo.

9.  Estos hallazgos de la comunidad científica han causado que la ranitidine haya sido retirada del mercado no solamente en Puerto Rico y los Estados Unidos, sino a nivel internacional. Incluso, antes de que se ordenara su retiro obligatorio el 1 de abril de 2020, muchos retiraron el producto voluntariamente del mercado. Sin embargo, no todos retiran voluntariamente el producto por razones que serán objeto de descubrimiento de prueba en este procedimiento. Por ello, citando niveles inaceptables e inevitables de NDMA en la ranitidine, la FDA ordenó el retiro inmediato e incondicional del medicamento.

10. Los altos niveles de NDMA en los productos hechos a base de ranitidine son observables y son el resultado de su estructura molecular inestable. Específicamente, los productos hechos a base de ranitidine liberan NDMA cuando la molécula de ranitidine: (1) se descompone en el sistema digestivo humano; (2) interactúa con varias enzimas en el cuerpo humano; (3) reacciona con el pasar del tiempo cuando es almacenada en condiciones normales e incrementa significativamente cuando se expone al calor; (4) durante el proceso de manufactura. En agregado, los productos que contienen ranitidine son equivalentes a billones de caballos de trolla que se introdujeron como contrabando en el cuerpo humano de millones de consumidores.

11. Zantac causó tanto daño a los residentes de Puerto Rico en gran medida porque Glaxo, el inventor de ranitidine, sucumbió a la tentación que es muy conocida en la industria farmacéutica: maximizar sus ganancias utilizando un monopolio muy lucrativo endosado por el gobierno.

12. Para promover la investigación y desarrollo, el sistema legal de los Estados Unidos ofrece dos incentivos muy poderosos a las corporaciones que inventan "*new chemical entities*" (NCE's). El primero es un patente para proteger los compuestos químicos. Segundo, los medicamentos nuevos aprobados

6

disfrutan de exclusividad endosada por la FDA, con independencia de si la molécula está protegida o no por uno o más patentes. Estas políticas permiten que los innovadores reciban el derecho exclusivo, por un tiempo limitado, a la venta de los productos en los Estados Unidos y Puerto Rico.

13. La justificación de estas franquicias y monopolios se basa en el animo de lucro. La investigación y el desarrollo tomo tiempo y es costoso. No todas las investigaciones son exitosas. Una vez aprobado un medicamente, un periodo de tiempo es necesario para que los innovadores puedan recuperar sus costos de sus intentos exitosos y no exitosos de investigación y desarrollo.

14. En cierta medida, el sistema funciona de la manera en que quisieron las personas que aprobaron las leyes y reglamentos aplicables. El resultado es que compañías farmacéuticas inventan medicinas que de otra manera no estarían disponibles en el mercado. Pero cuando un innovador posee el derecho y monopolio a una franquicia de la envergadura de Zantac, este tiene prácticamente una licencia para manufacturar dinero. La mayoría de los ingredientes para hacer los medicamentos son sumamente baratos, lo que da paso a márgenes de ganancia extraordinarios que no existen en ninguna otra industria.

15. Como resultado de estas realidades económicas, los manufactureros tienen un fuerte, y con frecuencia perverso, incentivo de vender tantos productos como estos puedan dentro del periodo de exclusividad. Es por esto que los medicamentos que tienen el derecho a explotar una marca invierten billones de dólares al año en ventas y mercadeo. Cuando una venta de un dólar puede dejar una ganancia de noventa centavos, la inversión en el desarrollo de la marca y el mercadeo son inversiones sumamente lucrativas. Sin embargo, los manufactureros de medicamentos que utilizan nombres comerciales no tienen

beneficio en ley o un incentivo económico equivalente para descubrir o investigar los riesgos asociados a sus productos.

16. Este dilema es especialmente preocupante cuando el medicamente es un "*bestseller*" incuestionable. Zantac fue la primera marca generó ventas de más de mil millones de dólares en ventas anuales. El éxito rotundo de Zantac catapultó a Glaxo por encima de sus anteriores rivales comerciales, provocó una capitalización extraordinaria y resultó en una serie de fusiones y acuerdos que resultaron en el nombre actual de la compañía, GlaxoSmithKline.

17. Si bien Glaxo no escatimó en recursos para promover Zantac agresivamente en el mercado, no hizo ninguna gestión para investigar los riesgos de cáncer asociados al ranitidine. Hacerse el ciego era mucho más lucrativo.

18. Los manufactureros del genérico ranitidine comparten la culpa por el cáncer de los demandantes por razones diferentes, pero igualmente perversas.

19. Para reducir los costos de las medicinas, el Congreso procura que haya competencia una vez el periodo de uso exclusivo del nombre comercial expira. Cuando el derecho a la manufactura exclusiva expira, los manufactureros de genéricos rápidamente entran al mercado luego de un procedimiento administrativo relativamente sumario conocido como "*Abbreviated New Drug Application*" ("ANDA") sin la necesidad de hacer pruebas clínicas y sin tener que probar que el medicamente es seguro y efectivo.

20. Cuando se trata de un medicamento tan popular como Zantac, la competencia en el mercado de genérico es amplia y fuerte. Ya que no tienen el beneficio de un monopolio legal o el beneficio de un nombre comercial, los manufactureros de genéricos compiten en términos de precio, lo que limita dramáticamente los beneficios en comparación con los manufactureros de medicamentos de marca comercial.

21. Según estimado de la FDA, cuando un genérico entra al mercado, el precio promedio del medicamento baja un 39% en comparación con el monopolio legal anterior. Una vez hay cuatro manufactureros en el mercado, el precio baja un 79%. Una vez hay seis fabricantes de genéricos, el precio se reduce por más de un 95%. En el caso de ranitidine, se cree que hay decenas de manufactureros de genéricos.

22. Ya que sus márgenes son muy finos, los manufactureros de genéricos tienen sus propias tentaciones económicas para tomar medidas para reducir los costos y no invertir en control de calidad. Los manufactureros de genéricos buscan capitalizar en la inversión que hizo otro en la investigación y no monitorean ni analizan los potenciales peligros que representan el producto que colocan en el mercado. Sin embargo, los manufactureros del medicamente genérico son responsables por los productos que colocan en el mercado. Márgenes de ganancia relativamente reducidos y competencia no son excusas legales valida para vender medicamentos que causan cáncer.

23. El sistema de justicia es el primera, última y única línea de defensa frente a la avaricia que no tiene un contrapeso debido al marco legal y reglamentario aplicable antes discutido que tiene la buena intención de que haya medicamentos seguros y efectivos en el mercado. Los demandantes solicitan ser compensados por sus horribles daños y pérdidas que han sufrido de manera tal que pueda hacerse justicia y que la mala conducta sea evitada en el futuro.

## LOS ACTORES EN EL MERCADO IDENTIFICADOS AL MOMENTO

24. Las personas mencionadas a continuación diseñaron, manufacturaron, mercadearon, distribuyeron, etiquetaron, empacaron, manejaron, almacenaron y/o vendieron ranitidine en Puerto Rico con la marca comercial Zantac o el genérico ranitidine en cualesquiera de sus formas:

a. Boehringer Ingelheim Pharmaceuticals, Inc., una coporación de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto seria almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC.
900 RIDGEBURY ROAD,
RIDGEFIELD, CONNECTICUT 06877

b. Boehringer Ingelheim Corporation, una corporación de Nevada y Connecticut. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto seria almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

BOEHRINGER INGELHEIM CORPORATION
900 RIDGEBURY ROAD,
RIDGEFIELD, CONNECTICUT 06877

c. Boehringer Ingelheim USA Corporation, una corporación de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a

10

sabiendas de que el producto seria almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

BOEHRINGER INGELHEIM USA CORPORATION
900 RIDGEBURY ROAD,
RIDGEFIELD, CONNECTICUT 06877

d. GlaxoSmithKline Puerto Rico, Inc., una corporación domestica de Puerto Rico. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto seria almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

GLAXOSMITHKLINE PUERTO RICO, INC.
AGENT: THE PRENTICE-HALL CORPORATION SYSTEM,
PUERTO RICO, INC.
C/O FAST SOLUTIONS, LLC
CITI TOWER 252 PONCE DE LEON AVENUE,
FLOOR 20
SAN JUAN, PR 00918

e. GlaxoSmithKline LLC, una compañía de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto seria almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en

11

la producción, empaque, rotulación, distribución y venta del producto es:

GLAXOSMITHKLINE LLC
FIVE CRESCENT DRIVE
PHILADELPHIA, PENNSYLVANIA, 19112

f. GlaxoSmithKline (America) Inc., una compañía de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

GLAXOSMITHKLINE (AMERICA) INC.
1105 N. MARKET STREET
SUITE 622
WILMINGTON, DELAWARE 19801

g. Pfizer Pharmaceuticals LLC, una compañía de Delaware que está registrada para hacer negocios en Puerto Rico (Registro # 140) y que tiene presencia física en Vega Baja, Puerto Rico. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

PFIZER PHARMACEUTICALS LLC
BO. CARMELITA CARR.
689 KM 1.9
VEGA BAJA, PR 00693

PFIZER PHARMACEUTICALS LLC
C/O REICHARD & ESCALERA, LLC (RESIDENT AGENT)
255 PONCE DE LEON AVENUE 10TH FLOOR
SAN JUAN, PR 00917

h. Pfizer Inc., una compañía de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

PFIZER INC.
235 EAST 42ND STREET,
NEW YORK, NEW YORK 10017

i. Sanofi-Aventis Puerto Rico Inc., una compañía de Puerto Rico (Registro 45124). Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

CORPORATION SERVICE COMPANY
C/O FAST SOLUTIONS, LLC

CITI TOWER 252 PONCE DE LEON AVENUE,
FLOOR 20
SAN JUAN, PR 00918

j. Sanofi-Aventis U.S. LLC, una compañía de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

SANOFI-AVENTIS U.S. LLC
55 CORPORATE DRIVE
BRIDGEWATER, NEW JERSEY 08807

k. Sanofi US Services Inc., una compañía de Delaware. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

SANOFI US SERVICES INC.
55 CORPORATE DRIVE
BRIDGEWATER, NEW JERSEY 08807

l. Amerisource Corporation, una compañía de Pensilvania registrada en Puerto Rico como una entidad foránea (Registro 11225). Se alega

14

jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

AMERISOURCE CORPORATION
#361 SAN FRANCISCO STREET PH
OLD SAN JUAN
SAN JUAN, PR 00901

AMERISOURCE CORPORATION
1300 MORRIS DRIVE
CHESTERBROOK,
PENNSYLVANIA 19087

m. AmerisourceBergen Corporation, una compañía de Pensilvania. Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

AMERISOURCE CORPORATION
1300 MORRIS DRIVE
CHESTERBROOK,
PENNSYLVANIA 19087

n. Cardinal Health P.R. 120, Inc., una compañía de Puerto Rico (Registro 21940). Se alega jurisdicción personal en Puerto Rico ya que esta

entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

CARDINAL HEALTH P.R. 120, INC.
CENTRO INTERNATIONAL DE DISTRIBUTION
CARR 165 KM. 2.4, EDIFICIO 10
GUAYNABO, PR 00965

HEALTH P.R. 120, INC.
CARDINAL HEALTH P.R. 120, INC.
PO BOX 366211
SAN JUAN, PR 00936

HEALTH P.R. 120, INC.
C/O CT CORPORATION SYSTEM
361 SAN FRANCISCO ST.
OLD SAN JUAN
SAN JUAN, PR 00901

o. Cardinal Health P.R. 218, Inc. es una compañía de Puerto Rico (registro 113060). Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

CARDINAL HEALTH P.R. 218, INC.
STATE ROAD 402 KM 0.9
AÑASCO, PR 00610

CARDINAL HEALTH P.R. 218, INC.
C/O CT CORPORATION SYSTEM
361 SAN FRANCISCO ST.
OLD SAN JUAN
SAN JUAN, PR 00901

p. Cardinal Health P.R. 436, Inc., es una compañia de Puerto Rico (Registro 152999). Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

CARDINAL HEALTH P.R. 436, INC.
C/O CT CORPORATION SYSTEM
361 SAN FRANCISCO ST.
OLD SAN JUAN
SAN JUAN, PR 00901

CARDINAL HEALTH P.R. 436, INC.
7000 CARDINAL PLACE
DUBLIN, OH, 43017

q. Cardinal Health P.R. 220, LLC, una compañia domestica de Puerto Rico (390023). Se alega jurisdicción personal en Puerto Rico ya que esta entidad ha participado en el diseño, manufactura, prueba (testing), mercadeo, etiquetamiento, empaque, almacenamiento y transporte interestatal de ranitidine, ya sea bajo el nombre comercial Zantac o en su genérico, a sabiendas de que el producto sería almacenado, distribuido y vendido a través de todo Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es:

17

CARDINAL HEALTH P.R. 220, LLC
CENTRO INTERNACIONAL DE DISTRIBUCIÓN ZONA LIBRE DE
COMERCIO
EDIFICIO #10, CARR. 165 KM 2.4
GUAYNABO, PR 00965-6211

CARDINAL HEALTH P.R. 220, LLC
C/O CT CORPORATION SYSTEM
361 SAN FRANCISCO ST.
OLD SAN JUAN
SAN JUAN, PR 00901

r.  McKesson Corporation, una corporación de Delaware registrada para
hacer negocios en Puerto Rico (Registro 13163).  Se alega jurisdicción
personal en Puerto Rico ya que esta entidad ha participado en el diseño,
manufactura, prueba (testing), mercadeo, etiquetamiento, empaque,
almacenamiento y transporte interestatal de ranitidine, ya sea bajo el
nombre comercial Zantac o en su genérico, a sabiendas de que el
producto sería almacenado, distribuido y vendido a través de todo
Puerto Rico.  La dirección física desde donde esta entidad participó en
la producción, empaque, rotulación, distribución y venta del producto
es:

MCKESSON CORPORATION
C/O FAST SOLUTIONS, LLC, CITI TOWER
252 PONCE DE LEON AVENUE, FLOOR 20
SAN JUAN, PR 00918

s.  Fulanos de Tal 1 -100, que representa a uno o más personas que están
en la cadena de distribución desde el origen hasta la venta en Puerto
Rico y que no se han identificado. Se alega jurisdicción personal en
Puerto Rico ya que esta entidad ha participado en el diseño,
manufactura, prueba (testing), mercadeo, etiquetamiento, empaque,
almacenamiento y transporte interestatal de ranitidine, ya sea bajo el
nombre comercial Zantac o en su genérico, a sabiendas de que el
producto sería almacenado, distribuido y vendido a través de todo

18

Puerto Rico. La dirección física desde donde esta entidad participó en la producción, empaque, rotulación, distribución y venta del producto es desconocida en este momento.

25. Las personas mencionadas a continuación etiquetaron, empacaron, manejaron, almacenaron y/o vendieron al detal Zantac o ranitidine en Puerto Rico a la parte demandante:

   a. Puerto Rico CVS Pharmacy, L.L.C.

PUERTO RICO CVS PHARMACY, L.L.C.
2114 CARR 2
BAYAMON, PR 00961-4849

PUERTO RICO CVS PHARMACY, L.L.C.
AGENT: CANCIO, NADAL & RIVERA L.L.C.
P.O. BOX 364966
SAN JUAN, PR 00936-4966

   b. Walgreen of Puerto Rico, Inc.

WALGREEN OF PUERTO RICO, INC.
C/O FAST SOLUTIONS, LLC, CITI TOWER
252 PONCE DE LEON AVENUE, FLOOR 20
SAN JUAN, PR 00918

   c. Drogueria Betances LLC

DROGUERIA BETANCES, LLC
AVE LUIS MUNOZ MARIN ESQ. TROCHE
FINAL BO TOMAS DE CASTRO
CAGUAS, PR 00725

DROGUERIA BETANCES, LLC
PO BOX 368
CAGUAS, PR 00726-0368

   d. Farmacias Caribe, Inc. (Rio Grande, Puerto Rico) - Registro Número 73484

FARMACIAS CARIBE, INC.,
CENTRO COMERCIAL ALTURAS DE RIO GRANDE
RIO GRANDE, PR 00745

FARMACIAS CARIBE, INC.,
PO BOX 1646
RIO GRANDE, PR 00745

e. Farmacia Cristina LMDM LLC (Bayamón)

FARMACIA CRISTINA LMDM LLC
200 AVE ORQUIDEA LOCAL 5
CENTRO COMERCIAL VALENCIA
BAYAMON, PR 00959-4159

FARMACIA CRISTINA LMDM LLC
200 AVE. ORQUIDEA, SUITE 5
REPARTO VALENCIA
BAYAMON, PR 00959

f. Farmacia Marilyn (Salinas)

FARMACIA MARILYN
PR-3 KM. 151.7, BO. COQUI
SALINAS, 00704, PUERTO RICO

g. Farmacia El Tuque (Ponce)

FARMACIA EL TUQUE
553 CALLE RAMOS ANTONINI, EL TUQUE,
PONCE, PUERTO RICO 00728-4806

h. Farmacia Baldorioty, Inc. (Coamo)

FARMACIA BALDORIOTY, INC.
CALLE BALDORIOTY
ESQUINA CARRION MADURO #9
COAMO, PR 00769

FARMACIA BALDORIOTY, INC.
P. O. BOX 378
COAMO, PR 00769

i. Corporacion Flores Rivera d/b/a Mi farmacia (Naranjito)

CORPORACION FLORES RIVERA
D/B/A MI FARMACIA
ST. 152 CEDRO ARRIBA, KM 9.9
NARANJITO, PUERTO RICO 00719

CORPORACION FLORES RIVERA
D/B/A MI FARMACIA
HC-01 BOX 5393
BARRANQUITAS, PR 00794

j. Super Farmacia Nelia, Inc. (Sabana Grande)

SUPER FARMACIA NELIA, INC.
16 FRANCISCO MARIANO QUIÑONES

SABANA GRANDE, PR 00637

k. Wal-Mart Puerto Rico, Inc.

WAL-MART PUERTO RICO, INC.
CARR # 1 KM 28.7
BARRIO RIO CANAS
CAGUAS, PR 00725

WAL-MART PUERTO RICO, INC.
C/O CT CORPORATION SYSTEM
PO BOX 9022946
SAN JUAN, PR 00902-2946

l. Fulanos de Tal 1 -100, que representa a uno o más minoristas que vendieron Zantac o ranitidine, en cualesquiera de sus formas, a la parte demandante. En este momento se desconoce la dirección física o postal.

## INTRODUCCION AL MERCADO DE ZANTAC O RANITIDINE

26. Las personas mencionadas en los tres párrafos anteriores diseñaron, manufacturaron, probaron, mercadearon, empacaron, manejaron, distribuyeron, almacenaron y/o vendieron ranitidine bajo su nombre comercial Zantac o su genérico equivalente, ya fuese el medicamento recetado o por prescripción, en las siguientes formas: inyección, syrup, granules, tabletas o capsulas.

27. Ranitidine pertenece a una clase de medicamentos conocidos como bloqueadores H2, que reducen la cantidad de acido que producen las células en el estomago. Otros medicamentos en esta categoría se mercadean bajo los nombres comerciales Tagamet, Pepcid y Tazac.

28. GlaxoSmithKline (GSK) desarrolló Zantac luego de, y en respuesta a, el éxito comercial de Tagamet. Patente Número. 4,128,658.

29. En 1983, la FDA aprueba a GSK su "*New Drug Application*" número 18-703 para vender Zantac.

30. En 1993, GKS se une a Warner-Lambert Company, hoy Pfizer, para desarrollar una versión de venta libre u "*over the counter*" de Zantac.

31. En 1995, la FDA aprueba las pastillas Zantac 75. NDA 20-520.

32. En 1998, la FDA aprueba Zantac 75 en versión de tabletas. NDA 20-745.

33. En 1998, GSK y Warner-Lamber terminaron su asociación de negocios. Warner-Lamber retuvo control de la marca Zantac y los medicamentos de venta libre, pero GSK retuvo control para hacer cambios o mejoras a la marca. GSK retuvo control de la venta de Zantac fuera de los Estados Unidos.

34. En el 2000, Pfizer adquirió Warner-Lamber y controló el Zantac de venta libre hasta diciembre 2006.

35. En octubre de 2000, GSK le vendió a Pfizer el resto de sus derechos sobre los medicamentos OTC, incluyendo la marca Zantac.

36. En octubre de 2003, Pfizer sometió la solicitud NDA 21-698 para que la FDA aprobara la venta del medicamento Zantac 150, solicitud que se aprobó el 31 de agosto de 2004.

37. Mientras Pfizer era dueño de los derechos de Zantac *over the counter*, GSK continuó manufacturando el producto.

38. En el 2006, Pfizer vendió sus derechos de Zantac a Johnson and Johnson, pero luego se transfirieron los derechos a Boehringer Ingelheim debido a exigencias legales asociadas a prácticas monopolísticas. Como resultado, Boehringer Ingelheim logró el control sobre todos los medicamentos Zantac de venta libre.

39. GSK continuó el mercado de Zantac por prescripción hasta el 2017.

40. Boehringer Ingelheim controló el Zantac de venta libre entre diciembre de 2006 y enero de 2017.

41. En el 2017, Boehringer Ingelheim vendió sus derechos sobre Zantac de venta libre a Sanofi. Como parte de dicho acuerdo, Boehringer Ingelheim continuó manufacturando Zantac de venta libre para Sanofi.

42. Sanofi controló el Zantac de venta libre, incluyendo venta y distribución, desde enero de 2017 hasta el 2019, cuando ocurrió un retiro del mercado del medicamento el 18 de octubre de 2019.

43. Sanofi, Pfizer, Boehringer Ingelheim mantienen disputas entre sí asociadas a las transferencias de activos antes descritas.

## MANUFACTUREROS DE MEDICAMENTOS GENERICOS HECHOS A BASE DE RANITIDINE INTRODUCIDOS A PUERTO RICO

44. Los manufactureros genéricos entraron al mercado en 1997.

45. La FDA ha aprobado decenas de compañías para manufactura de ranitidine genérica de prescripción y venta libre. Se desconoce la identidad de todos los manufactureros de genéricos cuyos productos han llegado a Puerto Rico, pero basado en data de la FDA se cree que las siguientes compañías, en este momento identificadas como FULANO DE TAL 1- 100, que podrían ser responsables y causantes legales de la introducción de ranitidine, en cualesquiera de sus formas, en el mercado de Puerto Rico:     Acic Pharmaceuticals, Inc.; Actavis Mid Atlantic; Acic Pharmaceuticals, Inc; Ajanta Pharma Ltd.; Amneal Pharmaceuticals of New York, LLC; Amneal Pharmaceuticals; Ani Pharmaceuticals Inc.; Aurobindo Pharma, Ltd.;  Appco Pharma LLC; Aurobindo Pharma, Ltd.; Ben Venue Laboratories Inc. d/b/a Bedford Laboratories; Boehringer Ingelheim; Breckenridge Pharmaceutical Inc.; Contract Pharmacal Corp.; Dr Reddy's Laboratories, Ltd.; Granules India, Ltd.; Hi Tech Pharmacal Co. Inc.; Lannett Co., Inc. 91288 Lannett Co., Inc.; Mylan Pharmaceuticals. Inc.; Mylan Laboratories Ltd.; Nostrum Laboratories Inc.; Dr Reddy's Laboratories Inc.; Glenmark Pharmaceuticals, Inc., USA; Heritage Pharma Labs Inc.; Mylan Pharmaceuticals, Inc.; Novitium Pharma LLC; Par Pharmaceutical Inc.; L. Perrigo Co.; Perrigo Research & Development Company; Pharmaceutical Associates Inc.;

Ranbaxy Pharmaceuticals Inc.; Ranbaxy Inc.; Sandoz Inc.; Strides Pharma Global Pte Ltd.; Strides Pharma Global Pte. Ltd.; Strides Pharma Global Pte. Ltd.; Strides Pharma Global Pte. Ltd.; Sun Pharmaceutical Industries Ltd.; Ranbaxy Pharmaceuticals Inc. Sandoz Inc.; Strides Pharma Global Pte. Ltd.; Strides Pharma Global Pte Ltd.; Sun Pharmaceutical Industries Ltd.; Taro Pharmaceuticals U.S.A., Inc.; Torrent Pharma Inc.; Unique Pharmaceutical Laboratories; Teva Pharmaceuticals U.S.A., Inc.; Vkt Pharma Private Ltd.; Watson Laboratories, Inc.; West-Ward Pharmaceuticals International Ltd.; Wockhardt, Ltd.; Zydus Pharmaceuticals(USA) Inc., así como cualquier otra cuyo nombre se desconoce pero se identifica en esta acción como FULANO DE TAL. Una vez la identidad y la participación de las compañías que manufacturaron genéricos introducidos al mercado Puerto Rico sea conocida como parte del descubrimiento de prueba, solicitaremos autorización para enmendar la demanda y hacer las alegaciones correspondientes.

## EL NDMA ES UN CANCERÍGENO

46. Múltiples entidades privadas y agencias del gobierno federal que consideran el NMDA como un cancerígeno humano.

47. La FDA considera el NDMA un químico que puede causar cáncer en humanos.

48. La organización mundial de la salud hay expresado que la evidencia conclusiva es que el NDMA es un cancerígeno potente.

49. La NDMA afecta el DNA a nivel microscópico.

50. La data científica sugiere que mientras más alta sea la exposición a altos niveles de NDMA, mayor es la probabilidad de causar cáncer.

51. La data científica sugiera que el NDMA también se relaciona con promover el desarrollo de tumores y reducir la capacidad del cuerpo humano para

combatir el cáncer. Por tanto, es un factor que contribuye al daño por razón del cáncer aún cuando haya otra causa identificable del cáncer.

52. El 26 de septiembre de 2019, la farmacia Walgreens y Wal-Mart anunciaron que retirarían voluntariamente los productos hechos a base de ranitidina.

53. El 28 de septiembre de 2019, la farmacia CVS anunció que retiraría voluntariamente los productos hechos a base de ranitidina.

54. El 8 de octubre de 2019, GSK anunció que retiraría voluntariamente los productos hechos a base de ranitidina a nivel internacional.

55. El 18 de octubre de 2019, Sanofi anunció que retiraría voluntariamente los productos hechos a base de ranitidina.

56. El 1 de noviembre de 2019, la FDA expresa que pruebas recientes apuntaban a niveles inaceptables de NDMA.

57. El 4 de diciembre de 2019, la FDA expresa que los consumidores que quisieran continuar el uso de ranitidine consideraran reducir la ingesta de comidas que contienen nitrato, como las carnes procesadas y los preservativos. Esto ya que la ranitidine reacciona con los nitratos de manera adversa.

58. El 2 de enero de 2020, se hizo pública una data científica que apuntaba a que la NDMA se desarrollaba en la ranitidine cuando el producto era expuesto a calor, lo que es normal como parte del envío, manejo y almacenamiento del medicamento.

59. El 1 de abril de 2020, en medio de la crisis de la pandemia, la FDA se vio forzada a anunciar el retiro obligatorio de todo producto hecho a base de ranitidine.

## RANITIDINE SE TRANSFORMA EN NDMA

60. La estructura molecular de ranitidine contiene en si misma las moléculas de NDMA, según se ilustra en la imagen a continuación:

25

Figure 1 – Diagram of Ranitidine & NDMA Molecules

61. El O=N en la molécula de ranitidine se puede combinar con el H3C-N-CH3 y formar el NDMA.

62. Existen evidencia científica que tiende a establecer que la ranitidine causa exposición a NDMA en cuatro maneras diferentes: formación de NDMA en el sistema digestivo; formación de NDMA como resultado de una reacción enzimática en el cuerpo humano; formación de NDMA bajo condiciones normales de almacenamiento que significativamente aumenta cuando hay calor; formación de NDMA durante el proceso de manufactura.

63. Durante el tiempo que se manufacturó y fue vendida la ranitidine, la evidencia científica apuntaba a la ranitidine exponía a las personas a niveles poco seguros de NDMA. Sin embargo, los demandados no informaron sobre dicho riesgo en la etiqueta ("*label*") del medicamento ni por ningún otro medio. También dejaron de reportar los riesgos a la FDA conforme a 21 C.F.R. sec. 314.81(b)(2). Los riesgos, así como sus obligaciones, fueron ignorados por los demandados.

64. El conocimiento de los riesgos de NDMA estaba disponible en la literatura científica y al alcance de los manufactureros y los distribuidores.

65. Los manufactureros nunca hicieron estudios para confirmar el vinculo entre la ranitidine y la NDMA.

26

66. Los manufactureros demandados se desviaron sustancialmente de sus obligaciones en el proceso de manufactura conforme a 21 C.F.R. § 210.1(a), así como en sus procesos de almacenamiento conforme a 21 C.F.R. § 211.142(b).

67. Los distribuidores vendieron ranitidine cuando el peso de la evidencia científica apuntaba a que la ranitidine exponía a sus usuarios a niveles poco seguros de NDMA.

68. Los distribuidores demandados dejaron de almacenar, transportar y manejar el ranitidine a una temperatura segura.

69. Los demandados, al no informar la NDMA era un ingrediente de la ranitidine, dejaron de informar el verdadero contenido del medicamento.

70. Los demandados dejaron de advertir a los consumidores los riesgos asociados al consumo de ranitidine.

71. Los demandados dejaron de dar instrucciones adecuadas a los consumidores en cuanto al consumo de ranitidine.

72. Los demandados dejaron de investigar los peligros del ranitidine de manera intencional.

73. Los demandados sabían o debían saber que los productos hechos a base de ranitidine eran irrazonablemente peligrosos.

74. La parte demandante se expuso a los productos que contenían ranitidine sin conocer que ello representada un riesgo irrazonable a su salud.

75. Los demandados sabían o debían saber que el diseño de los productos hechos a base de ranitidine eran peligrosos, defectuosos y no aptos para uso humano.

76. Los demandados sabían o debían saber que el diseño de los productos hechos a base de ranitidine eran peligrosos, defectuosos y no aptos para uso humano debido a los altos niveles de NDMA.

77. Los demandados sabían o debían saber que los productos hechos a base de ranitidine eran irrazonablemente peligrosos y que presentaban un alto riesgo de desarrollar cáncer cuando el medicamento se utilizaba de la manera indicada.

78. Los demandados sabían o debían saber que los productos hechos a base de ranitidine no habiendo sido sometidos a suficientes pruebas, investigaciones y estudios en cuanto a su capacidad para transformarse en un cancerígeno.

79. Los demandados pudieron haber descubierto con debida diligencia productos hechos a base de ranitidine tenían unas características peligrosas que opacaban por mucho cualquier utilidad que tuviese el medicamento. El daño causado por los demandados es mucho mayor a cualquier beneficio que pudiese tener el medicamento.

### PRODUCTO DEFECTUOSO

80. En Puerto Rico se impone responsabilidad absoluta del fabricante, distribuidor y vendedor por daños causados por productos defectuosos o peligrosos. Rivera v. Superior Pkg. Inc., 132 DPR 115, 125 (1992); Montero Saldaña v. Amer. Motors Corp., 107 DPR 452, 462 (1978); Ferrer v. General Motors Corp., 100 DPR 246 (1971). Todos los que intervienen en la cadena de fabricación y distribución responden solidariamente con el fabricante ante el perjudicado. Véase al respecto H. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, San Juan, Pubs. JTS, 1986, Vol. II, Cap. XVI, pág. 90.

81. El producto defectuoso se define como aquel que no iguala la calidad promedio de productos similares. Montero Saldaña v. Amer. Motors Corp., 107 DPR 452,462 (1978). La doctrina se basa en que todos los que intervienen en la cadena de fabricación y distribución responden de forma solidaria con el fabricante ante el perjudicado. Montero Saldaña v. Amer. Motors Corp.,

107 DPR 452,462 (1978). El demandante no tiene que presentar prueba de la negligencia del fabricante o vendedor, sino que tiene que probar que el producto era defectuoso y que el producto defectuoso fue la causa de las lesiones sufridas. Aponte v. Sears Roebuck de P.R., 144 DPR 830, 839 (1998).

82. El Tribunal Supremo de Puerto Rico ha citado con aprobación la norma de responsabilidad absoluta extracontractual ("*strict liability in torts*"), establecida por el Tribunal Supremo de California en el caso de Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1962). Allí, el Juez Presidente Traynor expreso así la norma: "…un fabricante o manufacturero responde absolutamente en daños y perjuicios cuando un artículo que pone en el mercado, a sabiendas de que va a ser usado sin una inspección de defectos, evidencia un defecto que ocasiona daños a un ser humano [y que] la responsabilidad no es una regida por la ley de garantías contractuales sino por la ley de responsabilidad absoluta en daños y perjuicios". La política pública que fundamenta la norma establecida en el citado caso es que "el propósito de tal responsabilidad es asegurar que el costo de los daños resultantes de los productos defectuosos sea sufragados por los fabricantes que enviaron tales productos al mercado en vez de las personas damnificadas que están impotentes para protegerse ellos mismos". Aponte v. Sears Roebuck, *supra*. El fabricante o vendedor es responsable por los defectos de su producto, siempre y cuando el lesionado lo utilice para un uso que sea razonablemente previsible para el fabricante. Aponte v. Sears Roebuck, *supra*.

83. Según establecido por la jurisprudencia, en el campo de *product liability*, existen tres (3) tipos de defectos que dan margen a la aplicación de la doctrina de responsabilidad absoluta. Estos son: defectos de fabricación, defectos de diseño y defectos por insuficiencia en las advertencias o instrucciones. Aponte v. Sears Roebuck, *supra*. Respecto a defectos de diseño, el Tribunal Supremo

de California elaboró un análisis, o "*test*", de dos alternativas. Así pues, el demandante prevalecerá en un caso de defecto de diseño si demuestra que: "(1) el producto falló en comportarse en forma tan segura como un usuario ordinario habría esperado al usar el producto para el uso para el cual fue destinado o para el cual previsiblemente podría ser usado, o si demuestra que, (2) [a] el diseño del producto fue la causa próxima de los daños y [b] el demandado no probó que en el balance de intereses, los beneficios del diseño en cuestión sobrepasan los riesgos de peligro inherentes en el diseño". Bajo la segunda alternativa, se traslada al fabricante la carga de la prueba de que los beneficios del diseño utilizado sobrepasan los riesgos inherentes al mismo. Aponte v. Sears Roebuck, *supra*.

84. Respecto a los defectos de fabricación, el Tribunal Supremo de Puerto Rico adoptó la definición de "defecto" sugerida por el entonces Juez Presidente Traynor, en el citado caso de Greenman v. Yuba Power Products Inc, supra, a los efectos de que "un producto defectuoso puede ser definido como aquél que falla en igualar la calidad promedio de productos similares y el manufacturero es entonces responsable por los daños resultantes de las desviaciones de la norma". Mendoza v. Cervecería Corona, Inc., 97 DPR 499, 512 (1969).

85. En el tercer tipo de defecto, aunque un producto no adolezca de defectos de fabricación o de diseño, se considera defectuoso si el fabricante o vendedor no ofrece al usuario o consumidor aquellas advertencias o instrucciones que sean adecuadas en torno a los peligros o riesgos inherentes en el manejo o uso del producto. Dicho deber se extiende a todos los usos del producto que sean razonablemente previsibles para el fabricante. Omitir las advertencias expone al fabricante a responsabilidad, si éste sabía, o debió haber sabido del peligro o riesgo envuelto, y la necesidad de dar la advertencia para garantizar el uso más seguro del producto. Aponte v. Sears Roebuck, supra.

30

86. Se ha establecido que cuando existe alguna controversia sobre los defectos de un producto, es necesario recurrir a la prueba pericial para que se establezca el elemento de defectuosidad, al menos cuando no se trata de un defecto patente. Randolph v. Collectramatic, Inc., 590 F.2d 844, 848 (10th Cir. 1979); Huddell v. Levin, 537 F.2d 726, 736 (3rd Cir. 1976).

87. Como resultado de las actividades coordinadas de todos los demandados de epígrafe, incluyendo otras personas aun no identificadas en la cadena de manufactura, distribución y venta en Puerto Rico, la parte demandante consumió por un periodo prolongado el ranitidine. Los demandados son responsables solidariamente por los daños de la parte demandante causados por la manufactura, diseño, mercadeo, distribución, venta y colocación en el mercado los productos hechos con ranitidine, de manera directa o indirecta a través de sus empleados, contratistas o agentes en el curso ordinario de sus actividades comerciales. Los demandados proyectaron en todo momento que el ranitidine era un producto seguro y efectivo, pero eso era falso.

## RECLAMOS INDIVIDUALES DE LOS DEMANDANTES

88. La Co-Demandante Ana Elena Roig Cardenales es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de diciembre de 2004 a marzo de 2020 y recibió diagnostico de cáncer de colon en junio de 2016 y cáncer de seno en junio de 2016. A continuación, su dirección física y postal, así como número de teléfono:

ANA ELENA ROIG CARDENALES
HC 03 BOX 17357
BO. RÍO JUEYES, PARCELA NUEVAS 746, CALLE 10
COAMO, PR 00769
TEL. (939) 243-9490 • FAX: NO TIENE

89. La Co-Demandante Ana Martínez Vázquez es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción

31

vendidos en Puerto Rico de aproximadamente de febrero de 2010 a agosto de 2019 y recibió diagnóstico de cáncer de endometrio en julio de 2015. A continuación, su dirección física y postal, así como número de teléfono:

ANA MARTÍNEZ VÁZQUEZ
PO BOX 483
EXT COQUI CALLE PLAYERO # 387
AGUIRRE, PR 00704
TEL. (787) 298-1238 • FAX: NO TIENE

90.    El Co-Demandante Ángel Tellado es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de 1997 a abril de 2020 y recibió diagnóstico de cáncer de colon en el año 2018. A continuación, su dirección física y postal, así como número de teléfono:

ÁNGEL TELLADO
150 AVE LOS PATRIOTAS
APT 173
LARES, PR 00669
TEL. (939) 429-4377 • FAX: NO TIENE

91.    La Co-Demandante Brenda Liz Martínez es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine sin prescripción vendidos en Puerto Rico de aproximadamente de enero de 2001 a febrero de 2020 y recibió diagnóstico de cáncer de colon en el año 2007. A continuación, su dirección física y postal, así como número de teléfono:

BRENDA LIZ MARTÍNEZ
33 CALLE CAYEY
BONNEVILLE HEIGHTS
CAGUAS, PR 00727
TEL. (787) 678-6780 • FAX: NO TIENE

92.    La Co-Demandante Carmen Morgado Ortiz es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de 1998 a abril de 2020 y recibió diagnóstico de cáncer de basalioma (carcinoma de células basales) en

el año 2019. A continuación, su dirección física y postal, así como número de teléfono:

CARMEN MORGADO ORTIZ
PALACIOS DEL RIO 1
483 TANAMÁ
TOA ALTA, PR 00953
TEL. (787) 568-3612 • FAX: NO TIENE

93. La Co-Demandante Carmen Plaza es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente marzo de 2010 a diciembre de 2019 y recibió diagnóstico de cáncer de seno en marzo de 2019. A continuación, su dirección física y postal, así como número de teléfono:

CARMEN PLAZA
URB ALTURAS DE RIO GRANDE
CALLE 18, S-983
RIO GRANDE, PR 00745
TEL. (787) 556-2472 • FAX: NO TIENE

94. El Co-Demandante Efraín Figueroa Báez es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente del año 1999 hasta el año 2020 y recibió diagnóstico de cáncer de próstata en enero de 2013. A continuación, su dirección física y postal, así como número de teléfono:

EFRAÍN FIGUEROA BÁEZ
CALLE WILLIAM JONES #491
SAN JUAN, PR 00915
TEL. (787) 544-4002 • FAX: NO TIENE

95. El Co-Demandante Germán Delgado Lugo es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de octubre de 2003 a septiembre de 2018 y recibió diagnóstico de cáncer de próstata en agosto de 2019. A continuación, su dirección física y postal, así como número de teléfono:

GERMÁN DELGADO LUGO
PARCELAS EL TUQUE #831 INTERIOR
CALLE ELIAS BARBOSA

PONCE, PR 00728-4735
TEL. (787) 527-5979 • FAX: NO TIENE

96.    La Co-Demandante Gloria Torres Meléndez es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de enero de 2001 a abril de 2020 y recibió diagnóstico de cáncer de linfoma non Hodkin (LNH) en noviembre de 2015. A continuación, su dirección física y postal, así como número de teléfono:

GLORIA TORRES MELÉNDEZ
ALTURAS DEL ROBLEGAL #11
UTUADO, PR 00641-9705
TEL. (787) 662-7491 • FAX: NO TIENE

97.    La Co-Demandante Iria Alvarado Collazo es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de junio de 2011 a diciembre de 2019 y recibió diagnóstico de cáncer de seno en octubre de 2017. A continuación, su dirección física y postal, así como número de teléfono:

IRIA ALVARADO COLLAZO
URB LAS AGUILAS I-31
CALLE 7
COAMO, PR 00769
TEL. (939) 267-1459 • FAX: NO TIENE

98.    La Co-Demandante José Luis Matos González es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de enero de 2002 a abril de 2020 y recibió diagnóstico de cáncer de colon en agosto de 2012. A continuación, su dirección física y postal, así como número de teléfono:

JOSÉ LUIS MATOS GONZÁLEZ
HC-02 BOX 6810
BARRIO BARRANCA, SECTOR MANÁ
BARRANQUITAS, PR 00794
(ZONA RURAL: NO HAY NUMERO DE CARRETERA)
TEL. (787) 857-6459 • FAX: NO TIENE

99. La Co-Demandante Lourdes Rivera González es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de 2005 a abril de 2020 y recibió diagnóstico de cáncer de basalioma (carcinoma de células basales) en el año 2018. A continuación, su dirección física y postal, así como número de teléfono:

LOURDES RIVERA GONZÁLEZ
URB SANTA MONICA
CALLE JERRY RIVAS DIAZ, G-49 APT 3 ALTO
BAYAMON, PR 00957
TEL. (787) 344-7884 • FAX: NO TIENE

100. La Co-Demandante Lynda Colón López es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de mayo de 2008 a agosto de 2019 y recibió diagnóstico de cáncer de seno en enero de 2014. A continuación, su dirección física y postal, así como número de teléfono:

LYNDA COLÓN LÓPEZ
85 URB SAN JOSE
SABANA GRANDE, PR 00637
TEL. (787) 477-6317 • FAX: NO TIENE

101. La Co-Demandante Miriam I Vélez Ocasio es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de julio de 2013 a abril de 2020 y recibió diagnóstico de cáncer de tiroide en marzo de 2019 y cáncer de piel en junio 2018. A continuación, su dirección física y postal, así como número de teléfono:

MIRIAM I VÉLEZ OCASIO
CALLE DENEB # 4551
PONCE, PR 00717
TEL. (787) 439-8382 • (787) 367-9570 •FAX: NO TIENE

102. La Co-Demandante Nilda J Acosta Montalvo es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de 1994 a marzo de 2019 y recibió diagnóstico de cáncer de intestino delgado y parte del grueso en agosto de 2019; y cáncer de matriz en el año 2018 (sarcoma). A continuación, su dirección física y postal, así como número de teléfono:

NILDA J ACOSTA MONTALVO
SABANA GRANDE APARTMENTS
EDIFICIO B APARTAMENTO 201, CALLE 25 DE JULIO
SABANA GRANDE, PR 00637
TEL. (787) 518-8739 • FAX: NO TIENE

103. El Co-Demandante Víctor D. Pérez Vázquez es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de 2001 a marzo de 2020 y recibió diagnóstico de cáncer de vejiga y próstata en de 2016. A continuación, su dirección física y postal, así como número de teléfono:

VÍCTOR D. PÉREZ VÁZQUEZ
URB SABANERA
CAMINO DE LAS POMAROSAS 166
CIDRA, PR 00739
TEL. (787) 900-7895 • FAX: NO TIENE

104. El Co-Demandante Wilfredo Casiano es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de desde 2008 hasta abril de 2020 y recibió diagnóstico de cáncer de tiroide en febrero de 2015. A continuación, su dirección física y postal, así como número de teléfono:

WILFREDO CASIANO
URB SAN ANTONIO
CASA # E-1
COAMO, PR 00769
TEL. (787) 329-0755 • FAX: NO TIENE

105. La Co-Demandante Yolanda Claudio es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente el año 2009 a abril de 2020 y recibió diagnóstico de cáncer de tiroide en enero de 2017. A continuación, su dirección física y postal, así como número de teléfono:

YOLANDA CLAUDIO
CALLE LEDESMA #958
BARRIO OBRERO
ARECIBO, PR 00612
TEL. (787) 815-0658 • FAX: NO TIENE

106. La Co-Demandante Yadira Delgado es residente de Puerto Rico, utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de enero de 2008 a abril de 2020 y recibió diagnóstico de cáncer de vejiga en abril de 2015. A continuación, su dirección física y postal, así como número de teléfono:

YADIRA DELGADO
PARCELAS EL TUQUE #831 INTERIOR
CALLE ELIAS BARBOSA
PONCE, PR 00728-4735
TEL. (787) 527-5979 • FAX: NO TIENE

107. Las Co-Demandantes Ana B Castro Rodríguez y María Castro Rodríguez presentan esta acción en representación de hermanas y únicas herederas de Esther R. Castro Rodríguez utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente desde el año 1998 hasta su muerte el 13 de julio de 2018 a causa de cáncer etapa 4 (metástasis). A continuación, su dirección física y postal, así como número de teléfono:

ANA B CASTRO RODRÍGUEZ
BOX 1329
RES VILLA MAR EDIF C, APT 63
AGUADILLA, PR 00605
TEL. (787) 431-9047 • FAX: NO TIENE

MARÍA CASTRO RODRÍGUEZ,

39 WILLARD ST
CHELSEA, MA 02150
TEL. (617) 416-5212 • FAX: NO TIENE

108. La Co-Demandante María de los Ángeles Vega Oliveras es residente de Puerto Rico, y presenta esta acción en representación de su madre, quien en vida utilizó medicamentos hechos a base de ranitidine con y sin prescripción vendidos en Puerto Rico de aproximadamente de agosto de 2007 a septiembre de 2017 y recibió diagnóstico de cáncer de cerebro (neoplasma) en abril de 2017. A continuación, su dirección física y postal, así como número de teléfono:

MARÍA DE LOS ÁNGELES VEGA OLIVERAS.
URB. ESTANCIAS YIDOMAR
CALLE VENUS W-27
YAUCO, PR 00698
TEL. (939) 208-7287 • FAX: NO TIENE

109. Los defectos en los productos de ranitidine fueron la causa legal y sustancial del diagnostico de cáncer y los daños sufridos por la parte demandante resultantes de dicho diagnóstico.

110. Los defectos en los productos de ranitidine fueron la causa próxima y previsible de los daños sufridos por la parte demandante, que incluye dolor permanente, sufrimiento, incapacidad, pérdida del disfrute de la vida, pérdida de ingresos, gastos médicos y en los propios medicamentos y en algunos casos, hasta la muerte.

**POR TODO LO CUAL**, la parte demandante solicita que todos los demandados sean hallados responsables, de manera solidaria, al pago de daños compensatorios por los daños físicos, emocionales y económicos sufridos asociados a la experiencia de vivir con cáncer en la medida máxima que lo permita la ley, así como el pago de costas, gastos de litigio y honorarios de abogado.

**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico, hoy lunes 21 de septiembre de 2020.

f/Zuleika Castro De Jesús
Lic. Zuleika Castro De Jesús
PR Bar No.: RUA-21258
FL Bar No.: 1022294
D'Jesus Law Offices
1969 S. Alafaya Trail #379
Orlando, FL 32828-8732
zcastro@djesuslaw.com
T.: (407) 267-7130
Fax: N/A

f/José Carlos Vélez Colón
Lic. José C. Vélez Colon
RUA  18913
Condominio Midtown
421 Ave Muñoz Rivera
Penthhouse #1009
San Juan, PR 00918
jvelez@velezlawgroup.com
Teléfono: (787) 599-9003
Fax: N/A